■ TANYA J. QUARTY, Appellant-Respondent, v KENNETH A. QUARTY, Respondent-Appellant. [948 NYS2d 130]—

Stein, J. Cross appeals from an order of the Supreme Court (Burns, J.), entered March 30, 2011 in Otsego County, ordering, among other things, equitable distribution of the parties' marital property, upon a decision of the court.

Plaintiff (hereinafter the wife) and defendant (hereinafter the husband) were married in September 2000[1] and have a daughter (born in 2000). The wife also has a son (born in 1996) from a prior marriage. She has full custody of her son and does not receive support from the child's father. In 2009, the parties each commenced separate actions for divorce, which were subsequently consolidated. In March 2010, they entered into a stipulation in which they resolved, among other things, issues of child custody and visitation, as well as the division of certain personal property. After a nonjury trial was held on the remaining issues including, as relevant here, equitable distribution and maintenance, Supreme Court entered an order directing that the marital residence be sold and the marital debts be paid from the proceeds of said sale. The court also awarded the husband spousal maintenance in the amount of $1,100 per month for 30 months, a share of the wife's pension and a distributive award in the amount of $155,372—to be paid in 396 monthly installments—based on the wife's enhanced earnings as a nurse practitioner. A judgment of divorce was thereafter entered. The wife now appeals and the husband cross-appeals.[2]

We begin with a review of Supreme Court's award of maintenance. "Maintenance is designed to provide temporary support while one spouse gains skills, education or experience necessary to become self-sufficient" (*Burtchaell v Burtchaell*, 42 AD3d 783, 785 [2007] [citation omitted]; *see Roberto v Roberto*, 90 AD3d 1373, 1376 [2011]). The amount and duration of maintenance are generally within the trial court's discretion and we

---

**1.** Although the husband's complaint indicates that the marriage was in June 2000, Supreme Court has apparently adopted the date set forth in the wife's complaint.

**2.** Although both parties have appealed only from the decision and order, we exercise "our discretion to treat such a premature notice of appeal as valid" (*Alessi v Alessi*, 289 AD2d 782, 782-783 [2001]; *see Hunter v Hunter*, 206 AD2d 700, 701 n [1994]).

will not disturb the court's determination where, as here, the court has considered the statutory factors and set forth its reasoning and such determination is supported by the record (*see Harrington v Harrington*, 93 AD3d 1092, 1094 [2012]). Here, the wife contends that this Court should vacate the award of maintenance in its entirety because Supreme Court failed to sufficiently set forth the statutory factors it considered and failed to consider the parties' predivorce standard of living, and because the husband is capable of being self-supporting. Conversely, the husband argues that the maintenance award should be nondurational because he is unable to be self-supporting due to his visual impairment.

At the time of their marriage, the husband was "legally blind" and he currently uses a guide dog, glasses and/or binoculars to assist him in certain tasks. At the time of the marriage, the husband was performing various odd jobs such as snowplowing and mowing with a tractor, as well as other types of property maintenance at a camp in exchange for free housing. When the parties first moved into the marital residence, the husband was responsible for maintenance of the exterior of the residence and assorted home improvement projects. The wife testified that the husband was also capable of performing certain household chores during the marriage, but that some tasks were very time-consuming for him. Although the husband admitted that he previously had employable skills, he claimed that his vision has since deteriorated,[3] rendering him unable to maintain employment.

The parties had been married for approximately 8½ years when the first action for divorce was commenced. At the time of trial, the husband was 57 years old and the wife was 34 years old. The husband was residing in a rented apartment and was receiving Social Security disability income of approximately $10,920 per year. The wife was earning $92,000 per year[4] and was receiving Social Security benefits for the parties' daughter in the amount of $440 per month.

---

**3.** The husband testified that, in September 2009, a "piece of calcium broke off from the aorta and went up into the back of the eye," blocking blood flow to his eyes. He further testified that he has bulging discs in his back and an unidentified problem with the arches of his feet. He offered no medical evidence to support these contentions, nor did he testify regarding what efforts he made, if any, to obtain employment.

**4.** The wife testified that her base salary at the time of trial was $70,000 per year and that she voluntarily worked additional "on-call" hours, which would increase her annual income to approximately $92,000. The wife further testified that the amount of on-call hours fluctuated according to her employer's needs and her availability.

In our view, while the record evidence pertaining to the husband's medical conditions and ability to become self-supporting is sparse, the award of spousal maintenance to the husband of $1,100 per month for 30 months is adequately supported by the record and is not an improvident exercise of Supreme Court's discretion. Supreme Court properly listed the statutory factors and specified the ones it considered (*see* Domestic Relations Law § 236 [B] [6]). Moreover, the record reveals that the parties' predivorce standard of living was modest and the maintenance award is a reflection of that standard (*see Burtchaell v Burtchaell*, 42 AD3d at 785; *Carman v Carman*, 22 AD3d 1004, 1008-1009 [2005]). In addition, according due deference to Supreme Court's credibility assessments, we discern no basis to disturb that court's implicit finding that the husband failed to convincingly demonstrate that he lacks the ability to work in some capacity. Accordingly, in our view, the determination to award durational maintenance was a proper exercise of Supreme Court's discretion (*see Burtchaell v Burtchaell*, 42 AD3d at 785) and provided a reasonable period of time to enable the husband to re-enter the work force and become self-sufficient.

We turn next to Supreme Court's determination that the husband was entitled to a distributive award of the wife's enhanced earnings resulting from the degrees and licenses she obtained during the marriage culminating in a nurse practitioner's license. Although the wife concedes that such enhanced earnings constitute marital property, she contends that the husband is not entitled to a share of their value because he failed to demonstrate that he made a significant contribution to her acquisition thereof and, alternatively, that the court's valuation was in error. The husband argues only that Supreme Court should have required that the distributive award be paid over a shorter period of time.

It is well established that "[a] nontitled spouse seeking a portion of the enhanced earning potential attributable to a professional license or degree of a titled spouse is required to establish that a substantial contribution was made to the acquisition of the degree or license" (*Esposito-Shea v Shea*, 94 AD3d 1215, 1217 [2012] [internal quotation marks and citations omitted]). In determining whether a nontitled spouse's contributions were substantial, we consider, among other things, whether that spouse altered his or her schedule and/or took on additional household duties that he or she would not have otherwise performed, in order to enable the titled spouse to obtain the license or degree (*see id.*; *Carman v Carman*, 22 AD3d at 1006-

1007; *Farrell v Cleary-Farrell*, 306 AD2d 597, 599-600 [2003]). Where the attainment of the license or degree is more directly attributable to the efforts of the titled spouse, it is appropriate to limit the nontitled spouse's share of the enhanced earning capacity (*see Esposito-Shea v Shea*, 94 AD3d at 1217; *Evans v Evans*, 55 AD3d 1079, 1080-1081 [2008]; *Farrell v Cleary-Farrell*, 306 AD2d at 599).

Here, the wife testified that she obtained two Associate's degrees prior to the marriage, in connection with which she had outstanding loans in the amount of approximately $32,000 at the time of trial. She began pursuing her nursing degree in January 2000 and obtained a Bachelor's degree and R.N. certification in 2003. Throughout her schooling, the wife worked at least part time and often full time. She also earned merit scholarships and incurred additional student loans to pay for tuition and household expenses. In 2004, the wife began a part-time graduate program, while continuing to work full time as a nurse. She began attending graduate school full time in 2005, took the board exams in the fall of 2007 and, after obtaining her license, began working full time as a nurse practitioner in 2008. The wife testified that the husband did not assist her with her school work or clinicals. She further testified that the family's sources of income were generally derived from her employment and the Social Security benefits of the husband and their daughter. She alleged that she requested the husband to obtain employment, which he denies.

According to the wife, she performed a myriad of household duties throughout her schooling. Among other things, because the husband was unable to drive, she did all the grocery shopping, transported both children to their activities and appointments and transported the husband's guide dog to veterinarian appointments. She acknowledged that, at various times, the husband was responsible for significant child-care responsibilities and household duties, including outdoor home maintenance. In addition, the husband used his Social Security disability funds to pay the mortgage on their home for some periods of time. The husband similarly testified that he cared for the parties' daughter and the wife's son while the wife attended school, prepared the children for school, assisted with their homework and prepared meals for them. He also took care of the children during the summer and on weekends, except when they were with their grandparents.

Based on the totality of the circumstances, we cannot say that Supreme Court's award to the husband of 25% of the value of the wife's enhanced earning capacity was an abuse of its

substantial discretion (*see Esposito-Shea v Shea*, 94 AD3d at 1217; *Farrell v Cleary-Farrell*, 306 AD2d at 599-600). However, we find that Supreme Court erred in its valuation thereof. The experts who testified on each party's behalf differed significantly in their calculations—with the husband's expert arriving at a value of $841,383 and the wife's expert opining the value to be $108,000. Thus, we must review the record, weigh the experts' testimony and reports and determine which valuation is properly supported by the evidence presented (*see Esposito-Shea v Shea*, 94 AD3d at 1217; *Cozza v Colangelo*, 298 AD2d 914, 915-916 [2002]).

Here, the husband's expert, William Blanchfield, premised his calculations on baseline earnings of $11,290 per year (the wife's actual earnings from part-time employment in 2002), a "topline" (post-license) income of $70,000 (as set forth in the wife's statement of net worth)[5] and a work life expectancy of approximately 28 years (until the wife reached age 62). Blanchfield also applied a 4% discount rate, an additional 33% discount rate for taxes and a 2% annual enhancement increase.

The wife's expert, T. Kevin Fahey, submitted a lengthy and detailed report. Fahey used baseline earnings of $46,000 in order to reflect the average income of an individual, like the wife, with a high school degree and two Associate's degrees working full time. Fahey—like Blanchfield in his report—used $70,000 as the wife's topline income. In addition, he applied a discount rate of 7% and an unspecified discount for taxes and assumed a work life expectancy of 33 years (until the wife reached the age of 67). Fahey also factored in the wife's probability of survival and of being employed for each year up to the age of 67.

In valuing the wife's enhanced earnings, Supreme Court appears to have adopted all of the assumptions used by Fahey in his calculations, except the topline income figure, which the court determined to be $92,000 based on the evidence of the wife's anticipated actual earnings in 2010. After deducting the balance of the wife's student loans (in an amount which Supreme Court did not articulate), the court calculated one half of the total value of the wife's enhanced earnings to be $376,744[6] and awarded the husband one half of that amount, less the total

5. Although Blanchfield initially utilized this amount in his report and trial testimony, he later testified in rebuttal that a nurse practitioner working in central New York can earn $88,000 per year. However, as pointed out by the wife's expert on rebuttal, Blanchfield provided no new valuation using this amount of income as the topline number.

6. Supreme Court did not otherwise specify how it ultimately arrived at that particular value.

amount of the maintenance award, resulting in a net distributive award to the husband in the sum of $155,372, to be paid at the rate of $392.35 per month for 396 months.

In our view, Supreme Court improperly valued the wife's license by using $92,000 as her topline income. To begin with, neither expert used that amount in calculating the value of such asset (compare *Esposito-Shea v Shea*, 94 AD3d at 1216-1217), nor was there any expert testimony that it would be appropriate to do so or, even if appropriate, specifically how it would affect the present value of the wife's license. Moreover, enhanced earnings are generally valued as of the date of commencement of a matrimonial action (see *Bean v Bean*, 53 AD3d 718, 720 [2008]; *Farrell v Cleary-Farrell*, 306 AD2d at 598), which in this case was 2009. In 2009, the wife earned approximately $68,000. Even using the wife's base salary for 2010, the year in which the trial was primarily conducted, the amount would have been $70,000, the amount used by both experts in their reports.

Inasmuch as Supreme Court relied primarily on all of the other assumptions underlying Fahey's valuation including, among other things, the discount rate, the wife's baseline earnings and her work-life expectancy—all of which have ample support in the record—we conclude that the court should have valued the wife's enhanced earnings at $108,000. Our independent review of the record reveals that the total outstanding balance of the student loan incurred by the wife during the marriage was $45,165.52, which must be deducted from the total value, leaving the amount of $62,834.48 subject to equitable distribution. Finding no basis to vary from Supreme Court's award to the husband of 25%, the distributive award shall be reduced to $15,708.62.[7] Given this reduced award, we also find it appropriate to modify the term of the wife's payments to the husband therefor. Accordingly, the distributive award shall be payable at the rate of $400 per month until the termination of the wife's maintenance obligation to the husband and, thereafter, at the rate of $1,000 per month until paid in full.

---

7. In our view, it is not necessary to deduct the wife's maintenance payments to the husband from this award in order to avoid impermissible "double dipping" on the enhanced earnings derived from the wife's professional license (see *Grunfeld v Grunfeld*, 94 NY2d 696, 704 [2000]). This is because we have concluded that the amount of maintenance awarded is reasonable based upon the wife's prelicense income of $46,000, combined with the $22,000 difference between the $70,000 topline earnings used in our determination of the value of the license and the $92,000 annual income to which plaintiff testified at trial. Thus, the amount of enhanced earnings used to calculate the value of the wife's license (the difference between the $46,000 baseline income and the $70,000 topline income) has not been considered in the maintenance award.

We find no merit to the wife's contention that she is entitled to a credit for her payment of the carrying costs of the marital residence—in which she has resided with her boyfriend and the two children—since September 2010. Under the particular circumstances of this case and giving due deference to Supreme Court's assessment of the evidence, we discern no abuse of the court's discretion and decline to disturb its determination (*see Soles v Soles*, 41 AD3d 904, 906 [2007]; *Chambers v Chambers*, 259 AD2d 807, 808 [1999]). Based upon the husband's unrefuted testimony that the wife acquiesced in his retention of certain Social Security payments received for the benefit of the parties' daughter during the pendency of this action, we likewise find no error in Supreme Court's refusal to credit the wife for such payments.

We do agree, however, that Supreme Court failed to properly determine each party's proportionate share of the wife's pension. Although the court directed that the pension be "split pursuant to the *Majauskas* formula," it did not provide any further guidance as to apportionment, as required (*see Chambers v Chambers*, 259 AD2d at 807). Thus, this matter must be remitted to Supreme Court for a determination of each party's proportionate share thereof (*see id.*; *Church v Church*, 169 AD2d 851, 852 [1991]; *Parks v Parks*, 159 AD2d 841, 842 [1990]). Supreme Court also failed to address the wife's request in her complaint for an award of child support. Accordingly, we must also remit this matter to the court for a determination of the parties' respective obligations, if any, therefor.

We have examined the parties' remaining contentions and find them to be without merit.

Spain, J.P., Kavanagh, McCarthy and Egan Jr., JJ., concur. Ordered that the order is modified, on the law and the facts, without costs, by reducing Supreme Court's distributive award to defendant to $15,708.62, payable at the rate of $400 per month until the termination of plaintiff's maintenance obligation and, thereafter, at the rate of $1,000 per month until paid in full; matter remitted to the Supreme Court for further proceedings not inconsistent with this Court's decision; and, as so modified, affirmed.